**Andrew M. ROHMAN, Plaintiff–Appellee,**

v.

**NEW YORK CITY TRANSIT AUTHORITY (NYCTA), Defendant,**

**Carmen J. Bianco, Defendant–Appellant.**

No. 98–9554.

United States Court of Appeals, Second Circuit.

Argued: July 15, 1999

Final Briefs Submitted: March 23, 2000

Decided: May 26, 2000

---

Richard Schoolman, Office of the General Counsel, New York City Transit Au-

thority, New York, NY, for Appellant Carmen J. Bianco.

David B. Turret, Sanocki Newman & Turret, New York, NY, for Appellee Andrew M. Rohman.

Before: WALKER, CABRANES, and SACK, Circuit Judges.

SACK, Circuit Judge:

The plaintiff, Andrew M. Rohman, brought this action in New York state court against Carmen J. Bianco and his and Rohman's former employer, the New York City Transit Authority (the "NYC-TA"). Rohman's complaint, as amended, alleged under 42 U.S.C. § 1983 that the defendants' complicity in Rohman's arrest and prosecution deprived him of his federal constitutional rights. Rohman also asserted state-law claims of malicious prosecution, false imprisonment and wrongful termination. Bianco and the NYCTA removed the case to the United States District Court for the Eastern District of New York (I. Leo Glasser, *Judge*) under 28 U.S.C. § 1443. After completion of discovery, the defendants moved to dismiss Rohman's complaint pursuant to Fed.R.Civ.P. 12(b)(6). Treating the defendants' motion as one for summary judgment under Rule 56(b) and relying on a substantial record developed during discovery, the district court granted the motion as to all Rohman's claims except for the § 1983 and state-law malicious prosecution claims against Bianco. *Rohman v. New York City Transit Auth.*, No. 97–CV–0231(ILG), 1998 U.S. Dist. LEXIS 19367 (E.D.N.Y. Oct. 30, 1998). Bianco appeals only from the district court's ruling on the § 1983 claim.

We conclude that as a matter of law it was not objectively unreasonable for Bianco to believe that his actions did not violate Rohman's constitutional rights. Bianco was therefore entitled to qualified immunity with respect to Rohman's § 1983 claim, and the district court erred in denying Bianco's motion for summary judgment on

that claim. We therefore reverse the order of the district court insofar as it denied Bianco's motion for summary judgment on Rohman's § 1983 claim and remand for further proceedings consistent with this opinion.

## BACKGROUND

From 1985 until his retirement in August 1995, Rohman worked for the NYC-TA as Manager of Rapid Transit Investigations in the Division of Field Operations, Office of System Safety. Rohman's job was "to provide the Authority with the capability of conducting professional, impartial, objective[ ] rail accident investigations on a 24 hour per day, 365 day per annum basis." He was assisted by several investigators under his supervision. Until April 1995, Rohman's own supervisor was Charles Yongue, whose title was Director of Field Operations. Yongue, in turn, reported to Bianco, who was Assistant Vice President of the NYCTA's Office of System Safety.

Prior to the events that gave rise to this litigation, Rohman was assigned an NYC-TA automobile to help him perform his "around the clock" duties. The NYCTA also gave him Triborough Bridge and Tunnel Authority ("TBTA") tokens for use when driving the vehicle through TBTA tunnels or over its bridges on NYCTA business. TBTA tokens were also distributed by Rohman to his investigators for their use on official business. Rohman was required to submit "token receipt sheets" detailing both his and the investigators' use of the tokens. The token receipt sheets identified the date each token was used, the name of the person using it, the NYCTA vehicle being driven when it was used, the value of the token used, and the TBTA bridge or tunnel where it was used.

The NYCTA gave Rohman a yearly "Management Performance Review." Throughout his career with the NYCTA, Rohman's review ratings were consistently high. This changed, however, with his

review for the period of June 10, 1993 to June 10, 1994. Yongue, whose responsibility it was to prepare the review, had originally planned to give Rohman an overall rating of "Good," but in November 1994 Bianco learned of Yongue's intention and demanded that Yongue change the rating to "Marginal." The downgrade would have the effect of depriving Rohman of a merit salary increase. According to Yongue's deposition testimony, Bianco "basically told" him that he would be fired if he did not give Rohman a "Marginal" rating. Yongue did so on December 13, 1994.

Rohman appealed the "Marginal" rating to Bianco, who in turn requested that Yongue provide supporting documentation for the evaluation. By memorandum dated February 8, 1995, Yongue refused, and expressed remorse for having acceded to Bianco's earlier threat: "I am ashamed that I did not have the courage of my convictions and that I allowed you to negatively influence my initial rating of Mr. Rohman's performance.... I will not fabricate responses to your questions since you know perfectly well why the rating on Mr. Rohman's [review] was changed."

After his appeal to Bianco failed, Rohman sought redress from an independent NYCTA Appeals Board. The Board interviewed Bianco, Yongue and Rohman and unanimously concluded that Rohman's "Marginal" rating should be upgraded to "Good." The Board explained its decision in a March 17, 1995 memorandum: "Mr. Rohman did not receive any written or oral warnings to indicate that his performance was marginal. Moreover, there is no documentation to support his drastic change in performance. All his previous reviews have been excellent."

Bianco informed Yongue of the Board's decision by memorandum dated March 27, 1995. After requesting, in response to the Board's recommendation, that Yongue develop an "improvement plan" for Rohman, Bianco ordered that Rohman be restricted in his use of NYCTA vehicles.[1] When Yongue voiced his concern about this restriction, Bianco responded by demoting Yongue and replacing him with another NYCTA employee, Ronald Alexander. According to Rohman's deposition testimony, when Rohman complained to Alexander, his new supervisor, about Bianco's restriction of his vehicle use, Alexander told him, "Brother, [Bianco]'s after you." Rohman contends that Alexander then authorized Rohman to take his NYCTA vehicle home notwithstanding Bianco's prohibition but not to record the trips on mileage sheets, which Alexander denies.

On Friday July 28, 1995, James Bromfield, Bianco's executive assistant, told Bianco that some System Safety Division investigators "were concerned that something improper had been occurring in the accounting for TBTA tokens distributed to accident investigators for their use when driving [NYC]TA vehicles at TBTA bridges or tunnels." The following Monday, July 31, Bianco asked Alexander whether he knew anything about the matter. Alexander told Bianco that earlier that same day Joseph Resch, a subway investigator working under Rohman's supervision, had expressed to Alexander concern "that Mr. Rohman might have been misreporting ... Resch's, TBTA token use."

Bianco and Alexander then obtained from the NYCTA employee in charge of NYCTA vehicles token receipt sheets and "passenger vehicle usage sheets"[2] for

---

1. Bianco later justified his action on the ground that bus accidents were more frequent than rail accidents. NYCTA personnel responsible for investigating bus accidents, he said, should therefore have greater access to the limited number of available NYCTA vehicles than officials such as Rohman who were responsible for investigating rail accidents.

2. Passenger vehicle usage sheets, maintained for every NYCTA vehicle, indicate each date the vehicle was used, the vehicle's driver, the starting point and destination for each trip made, the purposes of the trip, and the mileage.

Rohman and his investigators covering the previous three months. According to Alexander's declaration submitted to the district court, he, Bianco and Bromfield, Bianco's executive assistant, discovered a number of discrepancies. In some cases, a token receipt sheet indicated that one of the investigators had used a TBTA token at a particular location when there was no indication on the passenger vehicle usage sheet that this investigator had been using a NYCTA vehicle anywhere near that location. In other cases, a token receipt sheet indicated that Rohman had used a token at a particular location, but the corresponding passenger vehicle usage sheet did not reflect that Rohman had been driving near there. In all, Bianco, Alexander and Bromfield found some seventy-five apparent disparities as to token usage, counting round-trips as two separate events. According to Alexander, both Bianco and he thought that these discrepancies indicated that Rohman had repeatedly misappropriated TBTA tokens and submitted inaccurate and false documentation.

The same day, July 31, Bianco contacted both the New York City Police Department, with which he worked on a daily basis in connection with his NYCTA duties, and representatives of NYCTA's Labor Relations Office. Whether these communications were in person or by telephone is unclear.

The following day, August 1, Bianco met with police officers and Labor Relations Office personnel to discuss the matter. According to Bianco, "My purpose in calling this meeting was to ask for guidance on how to proceed; I invited the police because I wanted the NYPD's guidance...." He then prepared a memorandum dated August 2, 1995, purporting to detail the seventy-five instances of TBTA token abuse. The memorandum also suggested that Rohman had used his NYCTA vehicle for personal business in violation of NYCTA procedures and the personal directive he had been given. Bianco sent copies of the memorandum to both the

Labor Relations Office and the police. He also sent them each a copy of a memorandum written by Joseph Resch in which Resch denied that he had used some of the TBTA tokens attributed to him in token receipt sheets.

On August 3, 1995, after consultation with the Kings County District Attorney's Office, the police arrested Rohman as he reported to work. According to the declaration of Ralph Agritelley, who represented the Labor Relations Office at Bianco's August 1 meeting with the police, "As far as I know, neither Mr. Bianco nor any other [NYC]TA employee demanded or asked the Police Department to arrest Mr. Rohman (or demanded or asked the DA's office to have Mr. Rohman arrested, or prosecuted)." Bianco said much the same thing in his declaration. Later that month, Bianco resigned from the NYCTA to take a similar position with Amtrak.

A police "Field Investigation Work Sheet" dated August 3, 1995, listed Bianco as a "reporter," "witness," and "complainant" in the case against Rohman. A police department summary dated August 4, 1995, written by Officer Elizabeth Mahaney (whose responsibilities in the investigation of Rohman and his arrest are unclear) stated that "[t]his case was initiated at the request of A[ssistant] V[ice] P[resident] Carmen Bianco.... Mr. Bianco had information about a dishonest employee." Alexander, when asked at his deposition "whose idea ... the arrest" was, responded "Carmen Bianco," but he, like Agritelley and Bianco, stated in a declaration that Bianco had never demanded or asked the police department to arrest Rohman.

Rohman was charged with petit larceny, falsifying business records, and offering a false instrument for filing in connection with eight trips he made between April 23 and July 22, 1995. He was arraigned in the early morning hours of August 4 and released on his own recognizance. On December 19, 1995, the charges were dismissed, apparently because the District

Attorney's Office was unable to corroborate them to its satisfaction.[3]

Rohman began the present action in New York State Supreme Court, Kings County, on December 18, 1996 asserting, in effect, the "constitutional tort" of malicious prosecution. The defendants removed the case to the United States District Court for the Eastern District of New York pursuant to 28 U.S.C. § 1443 on January 18, 1997. After completion of discovery, the defendants moved to dismiss Rohman's complaint under Fed.R.Civ.P. 12(b)(6). Rohman then amended his complaint with the permission of the district court. The court decided to treat the defendants' motion to dismiss as a motion for summary judgment, which it granted as to all Rohman's claims against the NYCTA. *See Rohman,* 1998 U.S. Dist. LEXIS 19367, at *5, *49. With respect to Rohman's claims against Bianco, however, the court granted the motion on Rohman's false imprisonment and wrongful termination claims, but denied it as to his § 1983 and state law malicious prosecution claims. *See id.,* at *42, *49. Bianco appeals only the district court's denial of his motion for summary judgment on Rohman's § 1983 claim.

## DISCUSSION

Bianco argues on appeal that his motion for summary judgment on the § 1983 claim against him should have been granted because he was entitled, as a matter of law, to qualified immunity. Before turning to his arguments on the merits, however, we must first consider whether we have jurisdiction to hear this appeal.

### I. Appellate Jurisdiction

■ At the threshold, Rohman contends that in light of disputed issues of material fact affecting Bianco's asserted qualified-immunity defense, we may not now decide Bianco's appeal. We disagree.

■ Inasmuch as this appeal is taken from the denial by the district court of a motion for summary judgment rather than from a final judgment, it is interlocutory. Ordinarily, only final judgments may be appealed under 28 U.S.C. § 1291. But under the collateral order doctrine, interlocutory appeals may be taken from determinations of "claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *Cohen v. Beneficial Indus. Loan Corp.,* 337 U.S. 541, 546, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). Denials of qualified-immunity claims fall within this category. *See Mitchell v. Forsyth,* 472 U.S. 511, 530, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); *X–Men Sec., Inc. v. Pataki,* 196 F.3d 56, 65 (2d Cir.1999).

■ Not every collateral order denying a qualified-immunity claim is immediately appealable, however. "Where ... resolution of the immunity defense requires the adjudication of issues of fact that are inseparable from the merits, the denial is not immediately appealable." *Tolbert v. Queens College,* 164 F.3d 132, 138 (2d Cir.1999); *see also Behrens v. Pelletier,* 516 U.S. 299, 312–13, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996); *Johnson v. Jones,* 515 U.S. 304, 313, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995). But so "long as the defendant can support an immunity defense on stipulated facts, facts accepted for purposes of the appeal, or the plaintiff's version of the facts that the district judge deemed available for jury resolution," *Salim v. Proulx,* 93 F.3d 86, 90 (2d Cir.1996), we have appellate jurisdiction to resolve Bianco's appeal.

---

**3.** NYCTA administrative proceedings were also instituted against Rohman on August 3, 1995. According to Agritelley, the charges were ultimately, in effect, dropped in exchange for Rohman's agreement to retire. By agreeing to retire, Rohman was able to retain his pension which otherwise would have been at risk in the administrative proceedings.

Rohman asserts that this appeal is not governed by the collateral-order doctrine because the district court found that "genuine issues of material fact" remained to be resolved. *Rohman*, 1998 U.S. Dist. LEXIS 19367, at *16. But "a district court's mere assertion that disputed factual issues exist[ is not] enough to preclude an immediate appeal." *Salim*, 93 F.3d at 89. The issues of fact to which the district court referred related to Bianco's conduct and whether it satisfied an "element of Rohman's malicious prosecution claim." *Rohman*, 1998 U.S. Dist. LEXIS 19367, at *16. Resolution of those issues is not required to determine whether Bianco was entitled to qualified immunity because, if he is, immunity protects him irrespective of whether Rohman can establish the elements of malicious prosecution. Whether Bianco is protected by qualified immunity can be determined on the basis of plaintiff's version of the facts of the case. The possible existence of disputed factual issues relating to the malicious prosecution claim itself is therefore immaterial in our deliberations and does not deprive us of jurisdiction over the appeal or of the ability to decide the qualified-immunity issue. *See Salim*, 93 F.3d at 89; *Danahy v. Buscaglia*, 134 F.3d 1185, 1190–91 (2d Cir. 1998).

## II. Qualified Immunity

### A. Existence of a Constitutional Right

We "must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all." *Conn v. Gabbert*, 526 U.S. 286, 290, 119 S.Ct. 1292, 1295, 143 L.Ed.2d 399 (1999); *see also Medeiros v. O'Connell*, 150 F.3d 164, 169 (2d Cir.1998). We conclude that he has.

The elements of a malicious prosecution claim under New York law are "(1) that the defendant initiated a prosecution against the plaintiff, (2) that the defendant lacked probable cause to believe the proceeding could succeed, (3) that the defen-

dant acted with malice, and (4) that the prosecution was terminated in the plaintiff's favor." *Posr v. Court Officer Shield # 207*, 180 F.3d 409, 417 (2d Cir.1999) (citing *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir.1997)); *see also Colon v. City of New York*, 60 N.Y.2d 78, 82, 455 N.E.2d 1248, 1250, 468 N.Y.S.2d 453, 455 (1983). In order to allege a cause of action for malicious prosecution *under § 1983*, Rohman must assert, in addition to the elements of malicious prosecution under state law, that there was (5) a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights. *See Murphy v. Lynn*, 118 F.3d 938, 944–46 (2d Cir.1997); *see also Singer v. Fulton County Sheriff*, 63 F.3d 110, 116–17 (2d Cir.1995) (relying in part on common law and New York State malicious prosecution law in analyzing § 1983 malicious prosecution claim, and observing that "[t]he 'appropriate starting point' of the inquiry is the common law of torts" (quoting *Carey v. Piphus*, 435 U.S. 247, 258, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978))).

> The Fourth Amendment right implicated in a malicious prosecution action is the right to be free of unreasonable seizure of the person—i.e., the right to be free of unreasonable or unwarranted restraints on personal liberty. A plaintiff asserting a Fourth Amendment malicious prosecution claim under § 1983 must therefore show some deprivation of liberty consistent with the concept of "seizure."

*Singer*, 63 F.3d at 116; *see also Murphy*, 118 F.3d at 944. "[S]ince the gist of a claim for malicious prosecution is abuse of the judicial process, a plaintiff pursuing such a claim under § 1983 must show that the seizure resulted from the initiation or pendency of judicial proceedings." *Id.*

The district court erroneously assumed that the assertion of the four elements of a New York State malicious prosecution claim alone was enough to make out a cause of action under § 1983, without addressing whether Rohman demonstrated

a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights. *See Rohman*, 1998 U.S. Dist. LEXIS 19367, at *14. The error, however, was harmless because, in our view, Rohman has sufficiently demonstrated the requisite post-arraignment restraint of liberty. Specifically, Rohman alleged that he was required, as a condition of his post-arraignment release, to return to court on at least five occasions before the charges against him were ultimately dropped. In addition, we note that in New York, a criminal defendant released on his own recognizance, as Rohman was, must "render himself at all times amenable to the orders and processes of the court," N.Y.Crim. Proc. Law § 510.40, and therefore must ordinarily remain in the state. We conclude that these alleged limitations on his liberty, which as pleaded go beyond the fact of the arraignment itself, are enough, at least at the pleading stage, to implicate the Fourth Amendment. *See Murphy*, 118 F.3d at 945–46 (restrictions on out-of-state travel for an arraigned defendant and his required appearances in court amount to seizures for Fourth Amendment purposes).

### B. Federal Qualified Immunity on a State Malicious Prosecution Theory

Although Rohman thus successfully alleged the deprivation of an actual constitutional right, Bianco was nonetheless entitled to summary judgment on qualified-immunity grounds.

■■■ "The qualified immunity doctrine protects government officials from suits seeking to impose personal liability for money damages based on unsettled rights or on conduct that was not objectively unreasonable." *Tenenbaum v. Williams*, 193 F.3d 581, 595–96 (2d Cir.1999) (internal quotation marks and citations omitted) (alteration in original). Government officials are entitled to qualified immunity if (1) the conduct attributed to the official is not prohibited by federal law; (2) the plaintiff's right not to be subjected to such conduct by the defendant was not clearly established at the time of the conduct; or (3) the defendant's action was objectively legally reasonable in light of the legal rules that were clearly established at the time it was taken. *See X–Men*, 196 F.3d at 65–66 (internal quotation marks and citations omitted). "The objective reasonableness test is met—and the defendant is entitled to immunity—if 'officers of reasonable competence could disagree' on the legality of the defendant's actions." *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir.1995) (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)). Thus, "[i]f the court determines that the only conclusion a rational jury could reach is that reasonable officers would disagree about the legality of the defendant['s] conduct under the circumstances, summary judgment for the officer[ ] is appropriate." *Danahy*, 134 F.3d at 1190 (internal quotation marks omitted).[4]

---

4. Ordinarily, "[t]hese ... issues should be approached in sequence, for if the second is resolved favorably to the official, the third becomes moot; a favorable resolution of the first moots both the second and the third." *X–Men*, 196 F.3d at 66. For the reasons stated in the preceding section, the conduct attributed to Bianco in this case is prohibited by federal law. There is a question with respect to the second issue—i.e., whether in late July and early August 1995, when Bianco's behavior that is the subject of this suit occurred, his conduct violated clearly established rights of which a reasonable person would have known. It was at least arguably not until *Singer v. Fulton County Sheriff* and

*Murphy v. Lynn* were decided, on August 9, 1995 and July 8, 1997, respectively, that it became "clearly established" that arraignment under circumstances like those presented in this case sufficiently implicated the liberty interest of the arraigned person to give rise to a § 1983 cause of action. This argument was not made by Bianco, however, until he filed a supplemental brief requested by this Court on the relationship between § 1983 and state-law causes of action for malicious prosecution, long after oral argument in this appeal. Inasmuch as Rohman had no opportunity to respond to the argument and the district court no opportunity to address it, we decline to rest our holding on this ground.

The first element of a malicious prosecution cause of action, under state law or § 1983, is, as we have noted, "that the defendant initiated a prosecution against the plaintiff." *Posr*, 180 F.3d at 417.

"Initiation" in this context is a term of art. A person who tells law enforcement authorities that he or she thinks that a crime has been committed and does no more, does not thereby put him- or herself at risk of liability for malicious prosecution should the arrest or prosecution later be abandoned or result in an acquittal. Looking to New York common law to determine the nature of the elements of a constitutional malicious prosecution suit, we find it well settled that in order for an individual to "initiate" a prosecution for these purposes, "[t]he mere reporting of a crime to police and giving testimony are insufficient; it must be shown that defendant played an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." *DeFilippo v. County of Nassau*, 183 A.D.2d 695, 696, 583 N.Y.S.2d 283, 284 (2d Dep't 1992) (quoting *Viza v. Town of Greece*, 94 A.D.2d 965, 966, 463 N.Y.S.2d 970, 971 (4th Dep't 1983) (alteration in original)); *see also Present v. Avon Prods., Inc.*, 253 A.D.2d 183, 189, 687 N.Y.S.2d 330, 335 (1st Dep't 1999) ("One who does no more than disclose to a prosecutor all material information within his knowledge is not deemed to be the initiator of the proceeding.").

The record evidence relating to Rohman's arrest and prosecution is rather spare. We must view what evidence there is, though, in the light most favorable to Rohman. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Winter v. United States*, 196 F.3d 339, 346 (2d Cir.1999). Seen through this prism, the undisputed evidence in this case establishes that it was Bianco who was responsible for the NYC-TA investigation of Rohman; that it was Bianco who first informed the police on July 31, 1995 of Rohman's alleged misconduct; that the arrest was Bianco's "idea"; that he met with the police to discuss the allegations about Rohman on August 1; and that on August 2, Bianco forwarded to the police the memorandum written by Joseph Resch in which he denied that he had used the tokens allegedly misattributed to him by Rohman, and a memorandum Bianco himself had written detailing allegedly improper bridge toll charges submitted by Rohman. There is no evidence, however, suggesting that after Bianco completed his report to the police on August 2, he did anything further with respect to Rohman's arrest or prosecution.

Whether this conduct constituted "initiation" for purposes of malicious prosecution law is beside the point. Under the circumstances, it was objectively reasonable for Bianco to believe that he came within the safe harbor for the "mere reporting" of suspected crime.[5] That objec-

---

**5.** New York courts, in the course of discussing "initiation," have noted whether the defendant provided false information to, or withheld information from, the police. *See, e.g., DeFilippo*, 183 A.D.2d at 696, 583 N.Y.S.2d at 284. They have not made it entirely clear, however, whether truth and completeness are part of the test for "initiation," that is, whether a false or incomplete statement may constitute "initiation" where, under the same circumstances, a true and complete one does not. But even if truth and completeness are required to avoid liability for malicious prosecution, the issue for purposes of qualified immunity is not whether the information that Bianco gave the police was true and complete, but whether it was

objectively unreasonable for Bianco to *believe* that the information he gave the police was true and complete. There is nothing in the record to indicate that Bianco believed that the information he gave to the police was false or incomplete, save only the apparent inability of the prosecutors ultimately to confirm the information sufficiently to warrant ultimate prosecution. If Bianco's assertion was false, as Rohman claims, that without more would not permit the inference that he knew or thought that the assertions he made to the police were false at the time that he made them. *Cf. Bose Corp. v. Consumers Union of United States*, 466 U.S. 485, 511 & n. 30, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) (falsity does not establish knowledge of falsity

tively reasonable belief entitles him to protection under the doctrine of qualified immunity.

In seeking to rebut Bianco's qualified-immunity defense, Rohman points to the August 4, 1995 memorandum written by Elizabeth Mahaney that states, "This case was initiated at the request of A[ssistant] V[ice] P[resident] Carmen Bianco.... Mr. Bianco had information about a dishonest employee." The district court denied summary judgment on the "initiation" branch of the malicious prosecution claim entirely on the basis of Mahaney's statement that "this case was initiated at the request of AVP Carmen Bianco." *See Rohman*, 1998 U.S. Dist. LEXIS 19367, at *14–15 (internal quotation marks omitted).

This evidence provided an insufficient basis for the district court to deny Bianco's summary judgment motion. Assuming that the Mahaney report would have been admissible to establish the truth of the assertions it contains,[6] it does not help Rohman. The fact that Officer Mahaney happened to use the word "initiated" to characterize Bianco's actions for purposes of describing the genesis of Rohman's arrest is not proof that it was unreasonable for Bianco to believe that he was not "initiating" the prosecution, using that term with the specific meaning given to it by New York's law of malicious prosecution. The fact that Officer Mahaney referred to Bianco's communications with the police as a "request" also does not tend to show that it was unreasonable for Bianco to believe that he was "mere[ly] reporting ... a crime to [the] police" and therefore not "initiating" prosecution under New York

law. Indeed, even if Officer Mahaney had been addressing herself specifically to the law of malicious prosecution—which plainly she was not—we cannot conclude from her personal understanding that Bianco's actions constituted "initiation" and a "request" that "reasonable officers would [not] disagree ... under the circumstances," *Danahy*, 134 F.3d at 1190 (internal quotation marks), and view them as "mere reporting" instead.

Rohman also relies on a police "Field Investigation Work Sheet" in which Bianco is listed as a "reporter," "witness," and "complainant" and the memorandum written by Louis A. Billera, the officer in charge of the case, which states that "Bianco informed [Billera] that he had information of a dishonest [NYCTA] employee." But these materials are wholly consistent with the facts of this case viewed in the light most favorable to Rohman under which it was objectively reasonable for Bianco to believe that his actions were not tantamount to "initiation" of a prosecution. The district court therefore erred in finding that Bianco was not entitled to qualified immunity. *See Lennon*, 66 F.3d at 420.

### III. Malicious Prosecution under State Law

Our conclusion that Bianco's motion for summary judgment on the § 1983 claim against him must be granted on qualified-immunity grounds should not be understood as commentary on Rohman's remaining state-law claim for malicious prosecution. Rohman may be "richly entitled to a recovery," *Murphy*, 118 F.3d at 953 (Ja-

---

or reckless disregard of truth (defamation case)); *Peter Scalamandre & Sons v. Kaufman*, 113 F.3d 556, 560 (5th Cir.1997) (similar); *see also Herbert v. Lando*, 781 F.2d 298, 309 (2d Cir.1986) (inaccuracy learned after statement is made is "not relevant to the publisher's state of mind before publication" (defamation case)).

**6.** Under Fed.R.Civ.P. 56(e), only admissible evidence may be used to resist a motion for summary judgment, but the defendants ap-

parently did not challenge the admissibility of the Mahaney memorandum, by motion to strike or otherwise. *See generally* James W. Moore et al., 11 Moore's Federal Practice § 56.14, at 56–197 (3d ed. 1999) ("Materials submitted by a party in connection with a summary judgment motion may be challenged on grounds that would preclude consideration of the material for the purposes of the motion. The vehicle to make this type of contention is a motion to strike.").

cobs, J., dissenting), on that cause of action; that it was objectively reasonable for Bianco to believe that he was not engaged in malicious prosecution does not necessarily foreclose a reasonable jury from concluding that he was. That issue is not before us. We therefore remand the case to the district court for it, in its discretion, either to proceed on the state law malicious prosecution claim or to remand the claim to New York State Supreme Court for that purpose. *See Chanayil v. Gulati,* 169 F.3d 168, 171–72 (2d Cir.1999).

## CONCLUSION

For the foregoing reasons, the district court's denial of Bianco's motion for summary judgment as to Rohman's § 1983 claim is reversed and the case is remanded for further proceedings consistent with this opinion.