222 F.3d 99 (2nd Cir. 2000)
 JOHN ANDREW CUOCO, PLAINTIFF-APPELLEE-CROSS-APPELLANT,
v.
KENNETH MORITSUGU, DR.; J. MICHAEL QUINLAN; ROBERT BARRACO, DR., DEFENDANTS-APPELLANTS-CROSS-APPELLEES,
AND
DONALD MOORE; GREGORY L. HERSHBERGER; MUHAMAD MALIK, M.D.; MARTIN SALAMACK, DEFENDANTS-CROSS-APPELLEES.
 Docket No. 98-2954
August Term, 1999
 UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT
 Argued: November 3, 1999
Decided July 28, 2000
 
 Appeal from two orders of the United States District Court for the Southern District of New York (Lawrence M. McKenna, Judge) insofar as they denied defendants-appellants' motion for summary judgment. The plaintiff cross-appeals from the orders insofar as they dismissed her complaint against the defendants who have not appealed. We hold that all the defendants were entitled either to absolute or qualified immunity.
 Reversed in part, vacated in part, and remanded.[Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted]
 Mark R. Kravitz, Wiggin & Dana, New Haven, CT (David J. O'Callaghan, on the brief), for Plaintiff-Appellee-Cross-Appellant.
 Edward Scarvalone, Assistant United States Attorney, New York, NY (Mary Jo White, United States Attorney for the Southern District of New York, and Kay K. Gardiner, Assistant United States Attorney, on the brief), for Defendants-Appellants-Cross-Appellees and Defendants-Cross-Appellees.
 Before: McLAUGHLIN, Jacobs, and Sack, Circuit Judges.
 
 Sack, Circuit Judge
 
 1
 Plaintiff John Andrew Cuoco brought a pro se action claiming that she was denied estrogen treatments while incarcerated as a pre-trial detainee in the all-male Federal Correctional Institution at Otisville, New York ("FCI Otisville") in violation of, inter alia, her Fifth, Eighth and Fourteenth Amendment rights. The defendants and their employment at the time suit was instituted are:
 
 
 2
 J. Michael Quinlan Director, Federal Bureau of Prisons
Kenneth Moritsugu, M.D. Medical Director, Federal Bureau of Prisons
Gregory L. Hershberger Warden, FCI Otisville
Donald Moore Health Services Administrator, FCI Otisville
Robert D. Barraco, M.D. Chief Medical Officer and
 Chief of Health Programs, FCI Otisville
Muhamad Malik, M.D. Psychiatrist, FCI Otisville
Martin Salamack, Ph.D. Chief Psychologist, FCI Otisville
 
 
 3
 The United States District Court for the Southern District of New York (Lawrence M. McKenna, Judge) granted a motion to dismiss the complaint as to defendants Hershberger, Moore, Malik, and Salamack. The court declined to grant a motion to dismiss or for summary judgment brought by the remaining three defendants, Barraco, Moritsugu, and Quinlan (collectively the "Defendants-Appellants"). We conclude that all of the defendants enjoyed either qualified or absolute immunity from suit and were thus entitled to summary judgment. We therefore reverse in part, vacate in part, and remand to the district court for it to enter judgment for all the defendants.
 
 BACKGROUND
 
 4
 According to her detailed, carefully drafted amended pro se complaint, from which we draw the facts for purposes of this appeal, Cuoco was a pre-trial detainee at FCI Otisville beginning September 5, 1991. She was a preoperative male to female transsexual.[1] Prior to her arrest, she had been receiving synthetic estrogen treatments under the supervision of a physician to treat her gender identity dysphoria or transsexualism.
 
 
 5
 When Cuoco entered FCI Otisville, she told a physician's assistant about her condition. She also explained that she had been taking estrogen at dosages that were to be lowered three months later when she was to be operated on to remove her testicles. Cuoco was allowed to keep for self-administration the ten tablets of the hormone she had with her when admitted to the prison.
 
 
 6
 On September 10, Cuoco left her cell in administrative segregation to meet with the defendant Dr. Barraco. As he emerged from his office Barraco asked the corrections officer who had escorted Cuoco to his office whether he had brought "the HE/SHE." During the course of an ensuing medical interview, Barraco told Cuoco that he knew "absolutely nothing about transsexuals," and that he had "never diagnosed or treated a transsexual in [his] entire medical career." He asked Cuoco whether she expected the Bureau of Prisons to give her sex-change surgery and Cuoco responded that she had no "plans to undergo any surgery while incarcerated." Barraco agreed to renew Cuoco's prescription for synthetic estrogen, but only at one-quarter the level of her previous dosage.
 
 
 7
 The Bureau of Prisons Health Services Manual contains a paragraph devoted to treatment of transsexuals.
 
 
 8
 It is the policy of the Bureau of Prisons to maintain the transsexual inmate at the level of change existing upon admission to the Bureau. Should responsible medical staff determine that either progressive or regressive treatment changes are indicated, these changes must be approved by the [Bureau of Prisons] Medical Director prior to implementation. The use of hormones to maintain secondary sexual characteristics may be continued at approximately the same levels as prior to incarceration, but such use must be approved by the Medical Director.
 
 
 9
 Bureau of Prisons Health Services Manual, Program Statement 6000.3, § 6803.
 
 
 10
 A week after the interview, on September 17, Barraco told Cuoco that she would not get any synthetic estrogen because, not yet having undergone surgery, she was not a "true or genuine transsexual." He said that the Bureau of Prisons policy applied only to "true transsexuals." He told her that if she wanted hormones nonetheless, she would have to file an administrative remedy form.
 
 
 11
 In response, Cuoco threatened suicide. The defendant Salamack, chief psychologist at the prison, was then summoned. He attended to Cuoco's suicide threat but told Cuoco that because he was a psychologist and not a medical doctor, there was nothing he could do about her medication.
 
 
 12
 Cuoco began to suffer psychological and physical withdrawal symptoms resulting from the termination of the estrogen treatment. On September 20, Cuoco made further suicide threats, in response to which she was placed in a cell in the prison hospital furnished only with a stained mattress on a concrete slab. She was stripped to her underwear and forced to sleep with the lights on in the cold. When she complained of a resulting sore throat, she was told she would spend another day in the cell.
 
 
 13
 Cuoco had two brief meetings with the defendant Malik, a prison staff psychiatrist, during this period. He refused to discuss her medical problem with her and indicated that he could do nothing about the denial of the estrogen tablets.
 
 
 14
 Also on September 20, Cuoco filed an informal grievance. Barraco called Bureau of Prisons Medical Director Moritsugu to ask for authorization to deny Cuoco's request for hormone treatment. Moritsugu denied Cuoco's request by telephone even though, according to Cuoco, he knew or should have known of the withdrawal symptoms that would result. On September 23, Cuoco complained in writing to Health Services Administrator Moore about the denial of her medication and its implications. Moore did not respond.
 
 
 15
 On September 24, Barraco told Cuoco that Moore and Warden Hershberger had been apprised of the situation. The following day Cuoco spoke to Hershberger. He refused to hear Cuoco's complaints, remarking that Cuoco "should act like a man the way God intended."
 
 
 16
 After a flurry of legal activity, a disciplinary hearing officer said he would talk to both Hershberger and Barraco about the matter. And on October 25, Cuoco's lawyer sent Hershberger a letter asking about Cuoco's request for estrogen. There was no response.
 
 
 17
 Cuoco then filed her complaint. The defendants moved to dismiss it, or, in the alternative, for summary judgment, arguing that they were entitled to absolute immunity or qualified immunity and that the complaint failed to allege their personal involvement in the conduct at issue. They also claimed that there was no evidence in the record to support the assertion that Cuoco was a transsexual, rather than a homosexual who took estrogen for aesthetic purposes. Cuoco did not respond to the motion.
 
 
 18
 In a November 19, 1992 memorandum and order, the district court, construing the lawsuit's § 1983 claims as claims under Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971), because the defendants were federal rather than state officers, see Kingsley v. Bureau of Prisons, 937 F.2d 26, 30 n.4 (2d Cir. 1991), and the cruel and unusual punishment claim as a "deliberate indifference" claim under the Due Process Clause of the Fifth Amendment, see Ingraham v. Wright, 430 U.S. 651, 671 & n.40 (1977), dismissed the complaint as to Hershberger, Malik, Moore and Salamack for failure to state a claim upon which relief can be granted. The court found that the plaintiff had stated a claim against Barraco, Moritsugu and Quinlan, however, and that genuine issues of material fact existed with respect to the allegations against them. It therefore denied Barraco, Moritsugu and Quinlan's motion for dismissal or summary judgment.
 
 
 19
 On December 30, 1992, the Defendants-Appellants moved for reargument. At their request, the district court issued a memorandum endorsement dated January 15, 1993 that vacated the November 19, 1992 memorandum and order for the limited purpose of providing the district court with an opportunity to decide the reargument motion prior to the expiration of the defendants' time to appeal. Meanwhile, on January 11, 1993, Cuoco moved for reconsideration of the November 19 memorandum and order pursuant to Fed. R. Civ. P. 60(b). In support of her motion, Cuoco filed a carefully drafted, seventeen-page affirmation setting forth her version of the facts. Her appellate counsel characterizes the affirmation as "contain[ing] a graphic and detailed factual account of her claim." The affirmation was generally consistent with, if somewhat more detailed than, the amended complaint.
 
 
 20
 The district court did not rule on the reargument motions for nearly six years. On September 29, 1998, however, it denied Cuoco's motion for reconsideration and the Defendants-Appellants' motion for reargument, vacated its previous vacatur, and reinstated the November 19, 1992 memorandum and order. This appeal and cross-appeal from the 1992 and 1998 orders followed.
 
 DISCUSSION
 I. The Appeal
 A. Appellate Jurisdiction
 
 21
 Because "this appeal is taken from the denial by the district court of a motion for summary judgment rather than from a final judgment, it is interlocutory." Rohman v. New York City Transit Auth., 215 F.3d 208, 214-15 (2d Cir. May 26, 2000). As we recently explained:
 
 
 22
 Ordinarily, only final judgments may be appealed under 28 U.S.C. § 1291. But under the collateral order doctrine, interlocutory appeals may be taken from determinations of "claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated."
 
 
 23
 Id. (quoting Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546 (1949)). Denials of immunity claims fall within this category. See Mitchell v. Forsyth, 472 U.S. 511, 525 (1985) (absolute immunity); X-Men Sec., Inc. v. Pataki, 196 F.3d 56, 65 (2d Cir. 1999) (qualified immunity). While "a district court's summary judgment order that though entered in a 'qualified immunity' case, determines only a question of 'evidence sufficiency,' i.e., which facts a party may, or may not, be able to prove at trial... is not appealable," Johnson v. Jones, 515 U.S. 304, 313 (1995), this is not such a case. There are no facts that if proved at trial would deprive the defendants of immunity. The orders of the district court insofar as they denied the Defendant-Appellants' motion to dismiss and for summary judgment on immunity grounds are therefore appealable.
 
 B. The Deliberate Indifference Standard
 
 24
 Cuoco was in pre-trial detention at the time of the alleged incidents of which she complains. Because as a pre-trial detainee she was not being "punished," the "cruel and unusual punishment" proscription of the Eighth Amendment to the Constitution does not apply. The district court correctly concluded that Cuoco's claims arise under the Due Process Clause of the Fifth Amendment instead. See Weyant v. Okst, 101 F.3d 845, 856 (2d Cir. 1996). We have often applied the Eighth Amendment deliberate indifference test to pre-trial detainees bringing actions under the Due Process Clause of the Fourteenth Amendment. See, e.g., id. We see no reason why the analysis should be different under the Due Process Clause of the Fifth Amendment. Cf. San Francisco Arts & Athletics, Inc. v. United States Olympic Comm., 483 U.S. 522, 542 n. 21 (1987) (stating that equal protection analysis is same under Due Process Clause of the Fifth Amendment and Equal Protection Clause of the Fourteenth Amendment).
 
 
 25
 Because we apply the Fourteenth Amendment test developed in Weyant, a § 1983 action, to this Bivens action under the Fifth Amendment, it follows that Cuoco's action lies if the defendants denied her, an unconvicted detainee, "treatment needed to remedy a serious medical condition and did so because of [their] deliberate indifference to that need." Weyant, 101 F.3d at 856. There are therefore two elements to Cuoco's claim: She must show that she had a "serious medical condition" and that it was met with "deliberate indifference."
 
 
 26
 We assume for purposes of this appeal that transsexualism constitutes a serious medical need.
 
 
 27
 Courts have repeatedly held that treatment of a psychiatric or psychological condition may present a "serious medical need".... There is no reason to treat transsexualism differently than any other psychiatric disorder. Thus... plaintiff's complaint does state a "serious medical need."
 
 
 28
 Meriwether v. Faulkner, 821 F.2d 408, 413 (7th Cir. 1987). While the Second Circuit has not addressed the topic directly, we have approved of the description of transsexualism as "'a profound psychiatric disorder,'" and treated it in another context as a "medical condition." See Powell v. Schriver, 175 F.3d 107, 111 (2d Cir. 1999) (quoting Maggert v. Hanks, 131 F.3d 670, 671 (7th Cir. 1997)). The defendants dispute that Cuoco was actually a transsexual, but we are required on this appeal to view the facts in the light most favorable to Cuoco, see Pangburn v. Culbertson, 200 F.3d 65, 68 (2d Cir. 1999), and in that light Cuoco is a transsexual. The first element of her claim is therefore satisfied. For purposes of this appeal, her transsexualism constitutes a serious medical condition.
 
 
 29
 To establish the second element, deliberate indifference, "a plaintiff must show'something more than mere negligence'; but proof of intent is not required, for the deliberate-indifference standard 'is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" Weyant, 101 F.3d at 856 (quoting Farmer v. Brennan, 511 U.S. 825, 835 (1994)). "An official acts with the requisite deliberate indifference when that official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) (quoting Farmer, 511 U.S. at 837). "'[M]ere medical malpractice' is not tantamount to deliberate indifference," but it may rise to the level of deliberate indifference when it "involves culpable recklessness, i.e., an act or a failure to act... that evinces 'a conscious disregard of a substantial risk of serious harm.'" Id. at 703 (quoting Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996)) (internal quotation marks omitted)).
 
 C. Appeals of Moritsugu and Barraco
 
 30
 It is undisputed that Moritsugu and Barraco are doctors and members of the Public Health Service. They argue that as such they enjoy absolute immunity from Cuoco's suit, and that they therefore are entitled to summary judgment regardless of whether questions of fact exist as to the merits. "[T]he denial of a substantial claim of absolute immunity is an order appealable before final judgment, for the essence of absolute immunity is its possessor's entitlement not to have to answer for his conduct in a civil damages action." Mitchell, 472 U.S. at 525.
 
 
 31
 1. Statutory Immunity. Moritsugu and Barraco claim that they are absolutely immune under the terms of the Public Health Service Act, 42 U.S.C. § 233(a)(1998). Section 233(a) makes the Federal Tort Claims Act the exclusive remedy for specified actions against members of the Public Health Service:
 
 
 32
 The remedy against the United States provided by sections 1346(b) and 2672 of Title 28 [the Federal Tort Claims Act], or by alternative benefits provided by the United States where the availability of such benefits precludes a remedy under section 1346(b) of Title 28, for damage for personal injury, including death, resulting from the performance of medical, surgical, dental, or related functions..., by any commissioned officer or employee of the Public Health Service while acting within the scope of his office or employment, shall be exclusive of any other civil action or proceeding....
 
 
 33
 42 U.S.C. § 233(a) (emphasis added). The question is therefore whether the injury for which Cuoco seeks compensation was one "resulting from the performance of medical... or related functions" by Barraco and Moritsugu while acting within the scope of their offices or employment. Id.
 
 
 34
 "In construing the terms of a statute, we look first to its language to ascertain its plain meaning." Cheung v. United States, 213 F.3d 82, 89 (2d Cir. 2000). We conclude that under its plain meaning, § 233(a) covers the conduct of both Barraco and Moritsugu.
 
 
 35
 Cuoco alleges that Barraco and Moritsugu were inexperienced doctors (i.e., they lacked expertise about transsexualism), that they misdiagnosed Cuoco (i.e., they did not think she was a true transsexual), and that that explains why they prescribed the wrong course of treatment (i.e., they stopped estrogen treatments when they should have renewed Cuoco's prescription). The complained of behavior of these defendants thus occurred within the scope of their offices or employment and during the course of their "performance of medical... or related functions," 42 U.S.C. § 233(a). Cuoco's exclusive remedy for injuries caused by that behavior is therefore against the United States under the Federal Tort Claims Act.
 
 
 36
 Cuoco asserts that § 233(a) provides immunity only from medical malpractice claims. But there is nothing in the language of § 233(a) to support that conclusion. When Congress has sought to limit immunity to medical malpractice claims it has done so explicitly. See 38 U.S.C. § 7316(a)(1) (providing exclusive remedy "for damages for personal injury... allegedly arising from malpractice or negligence of a medical care employee" of the Veterans Health Administration).
 
 
 37
 The district court relied on Mendez v. Belton, 739 F.2d 15 (1st Cir. 1984), in holding that "Plaintiff's claims against defendants Moritsugu and Barraco... may not properly be dismissed on the basis of Section 233(a) immunity because Plaintiff has not brought medical malpractice claims, but rather a claim alleging violation of her constitutional rights." But Mendez is inapposite. It does not stand for the proposition that § 233(a) applies only to medical malpractice suits. The Mendez court commented that § 233(a) "protects Public Health Service officers or employees from suits that sound in medical malpractice," Mendez, 739 F.2d at 19, but it did so while considering an allegation of intentional discrimination on the basis of race and sex by a supervisor against an employee during a professional peer review process. That conduct, by contrast with that of Barraco and Moritsugu here, had nothing to do with the "performance of medical... or related functions." It was for that reason, not because the action was other than a medical malpractice claim, that § 233(a) was held to be inapplicable.
 
 
 38
 Of course Congress could not, by the simple expedient of enacting a statute, deprive Cuoco of her constitutional due- process rights, but that is not what § 233(a) does. It protects commissioned officers or employees of the Public Health Service from being subject to suit while performing medical and similar functions by requiring that such lawsuits be brought against the United States instead. The United States thus in effect insures designated public health officials by standing in their place financially when they are sued for the performance of their medical duties. Cf. 42 U.S.C. § 233(f) (listing alternative forms of insurance government can procure for public health officials when remedies against United States are likely to be precluded). The statute may well enable the Public Health Service to attract better qualified persons to perform medical, surgical and dental functions in order better to serve, among others, federal prisoners. "[W]hen defendants show that Congress has provided an alternative remedy which it explicitly declared to be a substitute for recovery directly under the Constitution and viewed as equally effective" the plaintiff is barred from bringing a Bivens action. Carlson v. Green, 446 U.S. 14, 18-19 (1980) (emphasis in original). We think that § 233(a) is just such an alternative remedy. See id. at 20 (citing § 233(a), in the Bivens action context, as an example of a statutory provision that explicitly designates an action under the Federal Tort Claims Act as the exclusive remedy).
 
 
 39
 Cuoco's response is to assert that the Federal Tort Claims Act is an inadequate alternative remedy because it does not provide for the declaratory or injunctive relief she seeks. Whatever the strength of that argument in the abstract, by the time the motions at issue in this appeal were made in the district court, Cuoco was no longer a pre-trial detainee and was no longer incarcerated in FCI Otisville. Her estrogen problem had also been resolved and she makes no claim that there is a danger that Moritsugu will again deny her necessary estrogen treatment. There is thus no basis for us to conclude that Cuoco had any claim against either Barraco or Moritsugu at the time the district court considered her complaint beyond a claim for compensation for her past treatment at FCI Otisville, which was entirely amenable to resolution under the Federal Tort Claims Act.
 
 
 40
 Finally, we emphasize that Barraco's and Moritsugu's positions as Public Health Service officials do not alone render them immune from suit. Critical to Barraco's immunity is the fact that his complained of behavior occurred entirely in his capacity as a doctor responsible for, and in the course of rendering medical treatment for, Cuoco. Similarly, Moritsugu's alleged misdeeds related only to his decision, as the principal medical official for the Bureau of Prisons, not to authorize a particular medical treatment for Cuoco. If Cuoco alleged and could prove that either of these defendants violated her constitutional rights in the course of something other than the performance of a medical or related function, or while acting outside the scope of his employment, § 233(a) would not, of course, provide that defendant with absolute immunity.
 
 
 41
 2. Inappropriate statements. Cuoco also alleges that she overheard Barraco asking a prison official, "Did you bring the HE/SHE?" Whether or not covered by § 233(a), this sort of rudeness and name-calling does not rise to the level of a constitutional violation. See Purcell v. Coughlin, 790 F.2d 263, 265 (2d Cir. 1986).
 
 A. Appeal of Quinlan
 
 42
 1. Principles of Qualified Immunity. A government official is entitled to qualified immunity from suit for actions taken as a government official if (1) the conduct attributed to the official is not prohibited by federal law, constitutional or otherwise; (2) the plaintiff's right not to be subjected to such conduct by the official was not clearly established at the time of the conduct; or (3) the official's action was objectively legally reasonable in light of the legal rules that were clearly established at the time it was taken. See Rohman, 215 F.3d at 216-17 (citing X-Men, 196 F.3d at 65-66). "Ordinarily, '[t]hese... issues should be approached in sequence, for if the second is resolved favorably to the official, the third becomes moot; a favorable resolution of the first moots both the second and the third.'" Id. at 216, n.4, (quoting X-Men, 196 F.3d at 66).
 
 
 43
 2. Quinlan's Qualified Immunity. The claim against Quinlan does not make it past the first criterion for qualified immunity. There is no conduct at all attributed to Quinlan in either the amended complaint or in Cuoco's affirmation except for his service as Director of the Bureau of Prisons. That conduct, if conduct it may be said to be, is obviously not prohibited by federal law.
 
 
 44
 The district court allowed the case against Quinlan to proceed because he was "the federal prisons' policy maker." "A supervisory official may be liable because he or she created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue," or "if he or she was grossly negligent in managing subordinates who caused the unlawful condition or event." Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir. 1986). But here there are no allegations and there is no evidence in the record to that effect. For liability to accrue, it is not enough for the defendant simply to be a "policy maker" at the time unconstitutional events occur.
 
 
 45
 Indeed, Cuoco makes no allegation that Bureau of Prisons policies or customs were unconstitutional -- to the contrary, she argues that Bureau policy mandated that she receive estrogen treatments. And there is no evidence or allegation that Quinlan knew about Cuoco's dispute with FCI Otisville officials or that he was personally involved in the decision to deny Cuoco estrogen. Finally, there is no allegation or evidence that Quinlan had supervisory authority over medical decisions made by doctors in federal prisons.
 
 
 46
 Quinlan is plainly immune from Cuoco's lawsuit.
 
 II. Cuoco's Cross-Appeal
 A. Appealability
 
 47
 While the district court allowed Cuoco's suit to proceed against Barraco,Moritsugu and Quinlan, it entered a partial final judgment dismissing Cuoco's complaint as to defendants Hershberger, Malik, Moore and Salamack. Such piecemeal litigation is generally disfavored. See Curtiss-Wright Corp. v. General Elec. Co., 446 U.S. 1, 8 (1980). But pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, a district court may enter a final, immediately appealable, partial judgment "upon an express determination that there is no just reason for delay." Fed. R. Civ. P. 54(b). "Since the certification is to be reviewed for abuse of discretion, it must be accompanied by a reasoned, even if brief, explanation... that there is no just cause for delay; a certification that is conclusory or merely quotes the words of the Rule is insufficient." L.B. Foster Co. v. America Piles, Inc., 138 F.3d 81, 86 (2d Cir. 1998); see also National Bank v. Dolgov, 853 F.2d 57, 58 (2d Cir. 1988) (per curiam) (dismissing appeal for lack of a final judgment where certification merely recited the words of Rule 54(b)).
 
 
 48
 The district court offered no explanation for entering a partial final judgment here, stating conclusorily that it "perceives no just reason for delay in the entry of judgment of dismissal in favor of those defendants." Ordinarily, this insufficiency would prevent us from exercising appellate jurisdiction over this cross-appeal. See L.B. Foster Co., 138 F.3d at 86. However, this case presents the unusual situation in which the entire case is before us via the Defendants- Appellants' interlocutory appeal. The reason we require a district court to justify entry of a partial judgment is in order to limit piecemeal litigation and maximize judicial efficiency. Under the present circumstances, however, where we can resolve the case in its entirety in this single appeal, those goals militate in favor of relaxing our interpretation of the district court's discretion under Rule 54(b). Otherwise, we would be sending the cross-appeal back to the district court to await a final judgment as to the claims against the Defendants-Appellants, a final judgment that we are today directing be entered on their behalf. We therefore assert jurisdiction over the cross-appeal.[2]
 
 B. Qualified Immunity
 
 49
 Cuoco cross-appeals from the district court's dismissal of her claims against Hershberger, Moore, Malik, and Salamack. She argues that dismissal was inappropriate and that material questions of fact exist that should have precluded summary judgment in their favor. In the alternative, she asserts that as a pro se litigant she should have been afforded the opportunity to revise her complaint in the district court. These arguments are without merit.
 
 
 50
 The district court dismissed the claims raised on appeal as to defendants Hershberger, Moore, Malik, and Salamack for failure to state a claim under Fed. R. Civ. P. 12(b)(6). It did so because these defendants were not involved in the decision to deny estrogen treatments to Cuoco.
 
 
 51
 Defendant Moore was the Health Services Administrator at FCI Otisville at the time of the allegations; defendant Hershberger was the Warden. The district court held that "[t]he absence of a factual predicate for the allegations against defendants Hershberger and Moore leads to the conclusion that these defendants are named in the action solely because of their supervisory positions. In a Bivens action, such a respondeat superior theory will not suffice." On appeal, Cuoco claims that these defendants were named not in their supervisory capacity, but because "each of the defendants was in a position to intervene" in the denial of estrogen, and, instead of doing so, "treated her with deliberate indifference."The district court did not consider this construction of the complaint. Cuoco's "failure to intervene" claim should have survived the defendants' motion to dismiss.
 
 
 52
 Although it was error to dismiss the complaint for failure to state a claim, we nevertheless affirm the judgment in favor of the defendants because they each were entitled to have their motions for summary judgment granted on qualified immunity grounds. There is no evidence that Hershberger or Moore, neither one a medical doctor, had the authority to intervene in an admittedly medical decision made by Drs. Barraco and Moritsugu. Nor on the undisputed facts could either have prescribed estrogen treatments for Cuoco, no matter how attentive to her problems and symptoms they were. They are therefore entitled to summary judgment on qualified immunity grounds both because (a) the conduct attributed to them is not prohibited by federal law, see section I.D.1, above, and (b) these defendants were non-doctors whose failure to intercede in the medical treatment of an inmate was, if wrongful, not objectively unreasonable, see section I.D., above.
 
 
 53
 Cuoco was under medical treatment. Cuoco suggests no basis on which to conclude that Moore or Hershberger should have challenged the responsible doctors' diagnosis. One can imagine the repercussions if non-medical prison officials were to attempt to dictate the specific medical treatment to be given to particular prisoners -- for whatever reason. It was, as a matter of law, objectively reasonable for Moore and Hershberger not to have done so with respect to Cuoco.
 
 
 54
 Defendant Malik's[3] status as a psychiatrist -- a medical doctor -- puts him in a slightly different position. But although he thus had the ability to prescribe medication, he had no responsibility for the treatment of Cuoco. Indeed, Cuoco accuses Malik only of refusing to discuss her medical problem and suggesting to her that he could do nothing about the denial of the estrogen tablets. It is undisputed that Malik was told that Baracco and Moritsugu, his superiors, had not diagnosed Cuoco as a transsexual. A doctor associated with a prison cannot be held responsible for failing to intercede in the treatment of a prisoner simply because the prisoner button-holes him and insists that he do so. The chaos that would ensue if doctors were to rush about treating prisoners who are not their patients in order to avoid such liability counsels otherwise. Malik's refusal to intervene in the medical treatment of another doctor's patient simply because the patient demanded it was objectively reasonable as a matter of law.
 
 
 55
 Cuoco's allegations against Salamack are more extensive. When Cuoco first met him, Salamack, a psychologist without a medical doctor's ability to prescribe drugs, told her that there was nothing he could do about her medication and warned her not to attempt to "manipulate the system." Then, after being notified that Cuoco was contemplating suicide, Salamack placed Cuoco on suicide watch.
 
 
 56
 According to Cuoco, Salamack "callously disregarded" her requests for estrogen and eventually had her restrained after she had "started being disruptive... by making noise and requesting medical treatment." Cuoco apparently argues that because Salamack witnessed the withdrawal symptoms that she was experiencing first hand he was deliberately indifferent to her needs by denying her estrogen or not explaining to the other defendants that she needed estrogen. But Salamack, having no medical degree, had no authority to decide what medical treatment was appropriate for Cuoco. He could, of course, have suggested a course of estrogen treatment assuming he knew enough medicine to do so and thought it the better course. But Salamack had been told that Cuoco was not a transsexual. Disregarding Cuoco's requests for estrogen, placing her on suicide watch, and telling her there was nothing he could do about her medication were, as a matter of law, not objectively unreasonable.
 
 C. Leave To Replead
 
 57
 Cuoco argues on appeal that the district court should not have dismissed her complaint for failure to state a claim without granting leave to replead. "A pro se complaint is to be read liberally. Certainly the court should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." See Gomez v. USAA Fed. Sav. Bank, 171 F.3d 794, 795 (2d Cir. 1999) (quoting Branum v. Clark, 927 F.2d 698, 705 (2d Cir. 1991)) (alteration omitted). But we do not find that the complaint "liberal[ly] read[]", id. at 795, suggests that the plaintiff has a claim that she has inadequately or inartfully pleaded and that she should therefore be given a chance to reframe. Cuoco, speaking through counsel on appeal, has suggested no new material she wishes to plead. The problem with Cuoco's causes of action is substantive; better pleading will not cure it. Repleading would thus be futile. Such a futile request to replead should be denied. See Hunt v. Alliance N. Am. Gov't Income Trust, 159 F.3d 723, 728 (2d Cir. 1998).
 
 
 58
 Cuoco asserts, finally, that under the rule of McPherson v. Coombe, 174 F.3d 276 (2d Cir. 1999), and Vital v. Interfaith Med. Ctr., 168 F.3d 615, 621 (2d Cir. 1999), summary judgment against her must be reversed because, as a pro se litigant, she was entitled to notice at the time of the summary judgment motion of the consequences of not responding to it. Even if Cuoco did fail to receive the requisite notice, there is no basis for reversal. In connection with her motion seeking reargument, she filed a detailed affirmation setting forth in evidentiary form her version of the facts of this case. This is precisely the document she could have filed previously had she been properly informed of her responsibilities in response to a summary judgment motion and been so inclined. We find that the defendants were entitled to summary judgment as a matter of law even assuming as we must that the assertions in Cuoco's affirmation are true. There is no purpose to be served by remanding the case to the district court simply to require that it rehear the motion for summary judgment and deny it.[4]
 
 CONCLUSION
 
 59
 For the foregoing reasons, we reverse the order of the district court insofar as it denied summary judgment to defendants Barraco, Moritsugu and Quinlan, and vacate the district court's dismissal of the complaint as to Hershberger, Moore, Malik, and Salamack. We remand for summary judgment to be entered for Barraco and Moritsugu on absolute immunity grounds pursuant to 42 U.S.C. 233(a) and for Quinlan, Hershberger, Moore, Malik, and Salamack on qualified immunity grounds.
 
 
 
 NOTES:
 
 
 [1]
 We therefore refer to the plaintiff using female pronouns.
 
 
 [2]
 We limit this jurisdictional ruling to cases in which our resolution of the interlocutory appeal obviates the need to dismiss the appeal of the partial judgment.
 
 
 [3]
 It is not clear from the record whether Malik and Salamack were Public Health Service officials. If they were, absolute immunity under 42 U.S.C. § 233(a) would protect them. See section I.C., above.
 
 
 [4]
 Cuoco argues in passing that the district court's dismissal was "especially wrong in light of the fact that the District Court had stayed discovery." Cuoco br. at 54. Cuoco is apparently complaining that she was prevented from obtaining all the discovery she sought prior to the district court's adjudication of the defendants' motion to dismiss and for summary judgment. This single, conclusory, one-sentence argument is insufficient to preserve any issue for appellate review. See Norton v. Sam's Club, 145 F.3d 114, 117 (2d Cir. 1998) ("Issues not sufficiently argued in the briefs are considered waived and normally will not be addressed on appeal.").
 Even if this issue had been fairly presented, moreover, we see no reason to expect that discovery would have helped Cuoco establish a triable issue of material fact. And we are particularly reluctant to remand for unnecessary discovery because this case revolves around questions of absolute and qualified immunity. One of the purposes of conferring immunity on public officials is to avoid the substantial "social costs" that litigation can impose on them, see Anderson v. Creighton, 483 U.S. 635, 638 (1987), one of which is the burden of "broad-reaching discovery," see Harlow v. Fitzgerald, 457 U.S. 800, 817 (1982). We therefore conclude that summary judgment for the defendants is appropriate despite the discovery limitations imposed on Cuoco by the district court.