**R.T., Plaintiff,**

v.

**Rudolph GROSS, M.D.; Charles Buscema; Kulwant Singh, M.D.; Maria Melendez, M.D.; Keith Ford; Lisa Mockus, Wayne Crosier and H.E. Smith Defendants.**

No. 02–CV–0159.

United States District Court,
N.D. New York.

Jan. 8, 2003.

Nina Loewenstein, Disability Advocates, Inc., Albany, NY, for Plaintiff.

Jeanette Rodriguez–Morick, Office of Attorney General, Albany, NY, Michael C. Rizzo, NYS Attorney General, Albany, NY, Paul G. Ferrara, Costello, Cooney Law Firm, Samuel C. Young, Costello, Cooney

& Fearon, PLLC, Syracuse, NY, for Defendants.

### DECISION and ORDER

MCAVOY, Senior District Judge.

## I. INTRODUCTION

Plaintiff commenced the instant action pursuant to 42 U.S.C. § 1983 contending that Defendants were deliberately indifferent to his serious psychiatric needs while he was incarcerated. Defendants move for summary judgment pursuant to Fed. R.Civ.P. 56 seeking dismissal of all claims.

## II. FACTS

Plaintiff has a history of psychiatric issues dating back to the 1970s, including psychiatric hospitalizations. Over the years, Plaintiff's compliance with prescribed therapies and medications has been intermittent and sporadic. In or about 1998, Plaintiff was incarcerated in a New York state correctional facility arising out an incident whereby he assaulted his mother and took his four year old daughter out of his mother's legal custody and fled to New Hampshire. Plaintiff spent part of his sentence at the Riverview Correctional Facility. While there, Plaintiff was observed smearing feces on the window of his cell in the Special Housing Unit ("SHU"). There also had been a report that Plaintiff was making a weapon from radiator parts.

In August 1999, Plaintiff was transferred to the Clinton Correctional Facility ("CCF"). Plaintiff was housed in CCF's Mental Health Satellite Unit ("MHSU") for several days. On August 9, 1999, Dr. Kanar completed a certification that Plaintiff be involuntarily committed to a psychiatric hospital.[1] Dr. Kanar consulted with Defendant Rudolph Gross, M.D., the Associate Clinical Director at Central New York Psychiatric Center ("CNYPC"). Based upon Kanar's evaluation of Plaintiff, Gross suggested that Plaintiff could be treated as an outpatient at CCF. Accordingly, Plaintiff was not transferred to the CNYPC. Plaintiff was discharged to the general population and placed on Office of Mental Health ("OMH") level one supervision, the highest level of supervision. On August 11, 1999, Dr. Kanar noted that Plaintiff did not have any symptoms of mental illness.

During the remainder of 1999, Plaintiff did not have any major episodes. In September 1999, a social worker observed Plaintiff to be evasive, guarded with flat affect, displaying grandiosity and bizarre rationalizations for his behavior, and having limited insight and judgment. In November 1999, the social worker observed Plaintiff as being loud and somewhat irritable and trying hard to be calm and in control. In December 1999, Plaintiff requested to be placed on medications because of impulses to attack others.

On January 10, 2000, Plaintiff was removed from his cell for further observation at the MHSU because he had flooded his cell and was found to be agitated. Plaintiff's mental health status fluctuated over the next several days. On January 13 and 14, Plaintiff was observed by Defendant Maria Melendez, M.D., the clinical director of the MHSU. Melendez again observed Plaintiff on January 18, 2000. For the three days prior to January 18, Plaintiff was noted to be quiet with no complaints. Melendez found that Plaintiff was not experiencing hallucinations or delusions and that there was no evidence of depression

---

1. The process for transferring correctional facility inmates to psychiatric hospitals is governed by N.Y. Corrections Law § 402.

or suicidal ideation. Although Plaintiff refused to take his medications, Melendez determined that Plaintiff was competent to make this decision. Accordingly, Melendez discharged Plaintiff from the MHSU.

On March 5, 2000, Plaintiff had an angry outburst in his cell. Plaintiff was observed to be yelling and swearing and destroyed several items in his cell. Plaintiff also threw liquid on a corrections officer and had a light ballast that he was threatening to throw at a corrections officer. Because this incident occurred on a weekend when no clinicians were available, Defendant Lisa Mockus, an R.N., was called to interview Plaintiff. Mockus concluded that Plaintiff's outburst occurred out of anger, rather than any symptoms of mental illness. Accordingly, Plaintiff was returned to his cell. As a result of this incident, Plaintiff was issued a disciplinary ticket. Plaintiff ultimately was sentenced to one year in SHU and one year's loss of good time.

In March 2000, Plaintiff was nearing his conditional release date of April 18, 2000. Accordingly, he was considered for admission into an assisted outpatient treatment program. Plaintiff was found not to meet the criteria for admission to the assisted outpatient treatment program. The assisted outpatient treatment committee did determine that Plaintiff needed hospitalization for stabilization prior to being sent to a civil hospital.[2] Because, however, Plaintiff received a series of disciplinary tickets, his good time was revoked, he was not eligible for release in April 2000 and, therefore, he was not eligible for an assisted outpatient treatment program. A mental exam conducted in March 2000 found Plaintiff to be within normal limits, with some minor exceptions.

On April 28, 2000, Plaintiff started a fire in his cell. After an examination conducted that same day, Plaintiff was found to be exhibiting some delusions, labile affect and threatening behavior. Accordingly, Plaintiff was transferred to the MHSU. By April 30, 2000, Plaintiff was noted to be in bed most of the day. When assessed by Melendez on May 1, 2000, Plaintiff was noted to be presenting with manic symptoms. Melendez treated these symptoms with Haldol (an antipsychotic medication). Melendez also ordered Depakote (a mood stabilizer). On May 3, consideration was given to the option of transferring Plaintiff to CNYPC for inpatient treatment. By May 8, however, Plaintiff was calm, was not presenting with signs of irritable mania and was taking his medications. Accordingly, Plaintiff was no longer considered for transfer to CNYPC. Melendez determined that Plaintiff's symptomatology during this period was related to an antisocial personality disorder rather than his bipolar disorder.[3] By May 18, 2000, Plaintiff was noted to have 98% medication compliance.

On June 26, 2000, Plaintiff was acting confrontational. During the summer of 2000, a treatment plan was prepared for Plaintiff. The plan was prepared by Defendant Keith Ford, a social work assistant, and approved by Defendant Kulwant Singh, M.D. Plaintiff refused to assist in

---

**2.** Pursuant to N.Y. Corrections Law § 402, an inmate can be transferred to a psychiatric hospital only upon the certification of two examining physicians. As of March 2000, Plaintiff did not have any such certifications and, thus, was not eligible to be transferred to a psychiatric hospital.

**3.** Defendants contend that antisocial personality disorder is not a mental illness and, therefore, Plaintiff would have been ineligible for transfer to a hospital. Plaintiff contends that antisocial personality disorder may be a partial form of a mental illness and, thus, Plaintiff may have been eligible for admission to a hospital.

the therapy or accept medications which, at least in part, frustrated the treatment plan.[4] During the period of July 2000 through October 2000, Plaintiff's medical records do not evidence any manic episodes, although he did receive disciplinary hearings concerning incidents occurring on August 26, 2000 (creating a disturbance), August 27, 2000 (committing an unhygienic act), and October 26, 2000 (assaulting the staff and committing an unhygienic act). The evidence in the record does, however, suggest that on July 11, 2000, Plaintiff was noted to be mute and then suddenly loud, combative, threatening and inappropriate. Ford observed that Plaintiff would sometimes be loud, disruptive, uncooperative and threatening.

On November 7, 2000, Plaintiff set his bedding on fire. At the request of a corrections officer, Ford and Singh went to Plaintiff's cell. Plaintiff became angry and threatened to kill Singh. Plaintiff complained that he had not received a shower in two weeks and that the corrections officers were defecating in his food.[5] Plaintiff threatened to continue setting fires until his demands were met. Ford did not observe any injuries to Plaintiff and concluded that there were no observable symptoms and that Plaintiff remained antisocial, but in no imminent danger.[6]

On November 11, 2000, Plaintiff set another fire in his cell. Plaintiff again threatened to continue setting fires until his demands for a shower and a shave were met. Because November 11 was a

weekend and no clinicians were available, Mockus responded to Plaintiff's cell. Mockus evaluated Plaintiff for the need for admission to the MHSU. Plaintiff stated that he wanted to see someone's blood on the floor and complained that he was only in prison because of a family dispute, that he was not receiving showers, he was not permitted to shave and his food was contaminated. Mockus determined that Plaintiff was exhibiting some signs of paranoia, but that he otherwise displayed no plan or intent to harm himself. Mockus determined that Plaintiff need not be transferred to MHSU at that time.

On December 5, 2000, Plaintiff again set fires in his cell. He also claimed to have a weapon. Plaintiff was sent to the MHSU. Singh gave Plaintiff an intramuscular Haldol injection. After a few days of appearing to be calm, cooperative and taking his medication and having reported that he was eating and sleeping, on December 11, 2000, Plaintiff was discharged to the general population.

On January 3, 2001, Plaintiff was again failing to take his medication. Singh noted that Plaintiff presented calm, cooperative and well-groomed with no delusions. Singh further noted that Plaintiff's speech was rapid and pressured and that he displayed labile affect. On January 9, 2001, Singh noted that Plaintiff had good attention to his activities of daily living. Singh again met with Plaintiff on February 1, 2001. At that time, Singh tried to explain to Plaintiff the benefits of taking his medi-

---

4. Plaintiff posits that the treatment plan was frustrated because Defendants did not sufficiently encourage trust and compliance. According to Plaintiff, trust and compliance likely could have been achieved had Plaintiff been transferred to a therapeutic environment (apparently some place other than prison).

5. It appears that, at about this time, Plaintiff learned that he lost custody of his children.

6. Ford testified at deposition that "it was reported from the officer that [plaintiff] was seen with the [wet] towel around his face and against the bars." Ford, thus, believed that Plaintiff used the towel to protect himself from smoke inhalation.

cation. Plaintiff, nonetheless, refused to take his medication. By February 27, 2001, Plaintiff expressed interest in his after care plans.

In March 12, 2001, as the end of his sentence approached, Plaintiff was recommended for and accepted for transfer to CNYPC "to provide him with the best chance at a successful discharge/release."

## III. STANDARD OF REVIEW

In addressing the pending motions for summary judgment, the Court will apply the familiar standards applicable to such motions, which need not be restated here. *Roman v. Cornell Univ.*, 53 F.Supp.2d 223, 232–33 (N.D.N.Y.1999); *Phipps v. New York State Dep't of Labor*, 53 F.Supp.2d 551 (N.D.N.Y.1999); *Riley v. Town of Bethlehem*, 44 F.Supp.2d 451, 458 (N.D.N.Y.1999).

## IV. DISCUSSION

■ To succeed on the claim that Defendants violated his Eighth Amendment rights, Plaintiff must proffer evidence from which a fair-minded trier of fact reasonably could conclude that Defendants acted with deliberate indifference towards his serious medical needs. *Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir.2003). This test encompasses an objective and subjective element. Whether a medical condition is sufficiently serious is an objective test. *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir.2003). Whether defendants acted with deliberate indifference to such a need is governed by a subjective test.

### a. *Whether Plaintiff Suffered From a Serious Medical Need*

■ To be sufficiently serious, the condition must present a substantial risk of harm. It must be a condition of urgency which, if not adequately treated, would produce death, degeneration or extreme pain. *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir.1994). It is "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes." *Smith*, 316 F.3d at 186.

■ Here, it may be assumed for purposes of this motion that Plaintiff suffers from a bipolar disorder. The question, then, is what is the particular risk of harm faced by Plaintiff due to the claimed deprivation of care. According to Plaintiff's expert, "bipolar mood disorder is a progressive illness; and the longer you suffer from it, the more episodes you have, the more severe the episodes, the worse the prognosis. So if you let somebody rot and deteriorate for a year or more because you don't take care of their illness and they get worse, they're going to have a worse lifelong prognosis." Pl.s' Ex. O at 101. In his report, Plaintiff's expert further stated that " '[i]f an inmate is that ill, keeping him from treatment now will inevitably cause him to become sicker, and make his ultimate rehabilitation more difficult and less certain.' " Pl.'s Ex. N at 18. Plaintiff's expert quantifies neither the likely degree of any lessened prognosis nor the likelihood that there will be such a lessened prognosis.

Defendants' expert stated in his affidavit that "[a] diagnosis of Bipolar Disorder or a history of manic episodes, does not in and of itself constitute a medical emergency.... The trajectory of [Plaintiff's] illness was characterized by exacerbations and periods of stabilizations." Morris Aff. at ¶. 4. Plaintiff's expert agrees that Plaintiff's mental illness is characterized by "periods of reasonably stable functioning and then occasional outbursts ... which were usually associated with medication non-

compliance." Pl.'s Ex. O at 39. While Plaintiff is stable there is no serious medical need.

Plaintiff's expert's statement that a lack of treatment may lead to a "worse lifelong prognosis" or less certain rehabilitation is based on conjecture and surmise. A possibility of a worse lifelong prognosis or less certain rehabilitation does not constitute a condition of urgency and does not pose a substantial risk of harm. Plaintiff points to no evidence that, in fact, any alleged lack of treatment caused him any harm, let alone serious harm. In fact, the undisputed evidence in the record suggests that Plaintiff's expert's conclusion is unfounded. Plaintiff's expert stated in his report that:

> [A]s his criminal sentence expired, [Plaintiff] was civilly committed to South Beach Psychiatric Center. He remained there from April to November 2001, and then was transferred as a voluntary patient to Manhattan Psychiatric Center, where he returned for one year. He thus finally returned to civil life in November 2002.
>
> [Plaintiff] did extremely well during these hospitalizations. After a period of adjustment, and coming to trust the treatment staff, he became medication compliant, cooperated fully in treatment programs, and his behavior became excellent; cooperate and compliant, he received virtually no behavioral reprimands during the entire course of these hospitalizations. When I interviewed him in May 2002, he expressed a great deal of positive regard for the treatment at Manhattan Psychiatric Center. He attended school, went out to yard with other patients, went to the gym, took art lessons and leisure education classes, and he proudly told me that during that

entire year: "I did not lose my privileges ever—not once!" He explained why, very simply: "People aren't as hostile in a hospital."

> Since his discharge, he has been living in a small apartment by himself. He visits regularly with his mother, with whom he has reconciled after the unfortunate episode in 1998, and he maintains some continuing contact with his wife. He is back on Social Security Disability payments; he attends a mental health clinic regularly, and is maintained on antipsychotic and anticonvulsant medications.

Pl.'s Ex. N at 15.

Plaintiff's successes since being discharged from Clinton only serve to demonstrate that he suffered no substantial harm as a result of any alleged lack of, or delayed, treatment while incarcerated.[7] Because Plaintiff has not submitted any verifiable evidence indicating that a failure to treat his condition adversely affected his prognosis, he cannot be said to be have had a serious medical need. *See Smith,* 316 F.3d at 189 ("Although [the plaintiff] suffered from an admittedly serious underlying condition [HIV], he presented no evidence that the two alleged episodes of missed medication resulted in permanent or on-going harm to his health, nor did he present any evidence explaining why the absence of actual physical injury was not a relevant factor in assessing the severity of his medical need."); *Dulany v. Carnahan,* 132 F.3d 1234, 1243 (8th Cir.1997); *Hill v. Dekalb Regional Youth Detention Ctr.,* 40 F.3d 1176, 1188 (11th Cir.1994) ("An inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental ef-

---

**7.** Moreover, as is evidenced by the ensuing discussion, the evidence demonstrates that Plaintiff was never denied care. Every time Plaintiff had an acute episode of his mental illness, he was treated and stabilized.

fect of delay in medical treatment to succeed.").

Undoubtedly, there are situations where a psychiatric condition can pose a risk of serious harm. *See Cuoco v. Moritsugu,* 222 F.3d 99, 106 (2d Cir.2000). As Plaintiff's expert noted, Plaintiff's condition is characterized by "occasional" outbursts. It may be assumed that, in certain circumstances, instances of acute flare-ups of a bipolar condition may present a serious medical need. Here, however, Plaintiff's expert offers no opinion as to how or why such outbursts are likely to result in substantial harm if left untreated. *See Smith,* 316 F.3d at 188–89. There is no evidence that the failure to treat Plaintiff's condition posed a danger to him or that a failure to treat was otherwise likely to result in serious harm. *Id.* Significantly, Plaintiff has been out of prison since 2001 and, thus, we have the benefit of hindsight to evaluate the consequences of any inadequate treatment while he was incarcerated at CCF. Plaintiff offers no evidence that he was harmed, mentally or otherwise, as a result of his acute episodes while incarcerated at CCF. *Id.* Accordingly, the Court finds that Plaintiff has failed to demonstrate that he had a serious medical need. There is no evidence in the record that he did, or was likely to, suffer serious medical (including mental) illness as a result of any deficient treatment at CCF. *See Helling v. McKinney,* 509 U.S. 25, 32, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993).

#### b. *Deliberate Indifference to a Serious Medical Need*

■ Assuming, *arguendo,* that Plaintiff's mental condition did constitute a serious medical need, the next question is whether Defendants acted with deliberate indifference towards that need. As the Second Circuit has stated:

"Deliberate indifference" describes a mental state more blameworthy than negligence; but a plaintiff is not required to show that the defendant acted for the "very purpose of causing harm or with knowledge that harm will result." *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citing *Estelle [v. Gamble],* 429 U.S. at 104, 97 S.Ct. 285, 50 L.Ed.2d 251). Deliberate indifference is "a state of mind that is the equivalent of criminal recklessness." *Hathaway v. Coughlin* ("Hathaway II"), 99 F.3d 550, 553 (2d Cir.1996). A showing of medical malpractice is therefore insufficient to support an Eighth Amendment claim unless "the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm.'" [*Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998) ].

*Hernandez,* 341 F.3d at 144.

Assuming Plaintiff's mental illness constituted, or was likely to constitute, a serious medical need, viewing the evidence in the light most favorable to Plaintiff and drawing every reasonable inference in his favor, the Court finds that no fair-minded trier of fact could reasonably conclude that Defendants were deliberately indifferent to Plaintiff's serious medical needs. Indeed, viewing the evidence in the light most favorable to Plaintiff, a fair-minded trier of fact could conclude that there was less-than-perfect and, perhaps, negligent care, but, there is no evidence in the record demonstrating that any of the Defendants consciously disregarded a substantial risk of serious harm to Plaintiff. Each of Plaintiff's allegations will be discussed more fully *seriatim.*

#### c. *Claims Against Defendant Gross*

■ Plaintiff claims that Gross was deliberately indifferent to Plaintiff's need for

psychiatric hospitalization in August 1999 by refusing to send him to CNYPC. Plaintiff contends that Gross was deliberately indifferent because he denied Plaintiff admission to the CNYPC against Dr. Kanar's recommendation and without having examined Plaintiff.

As Kanar's medical notes indicate, he discussed Plaintiff's disposition with Gross. The reason Kanar initiated the transfer to the CNYPC and contacted Dr. Gross was because Kanar believed that there was a legal requirement that some sort of disposition had to be made with respect to an inmate retained in the mental observation unit for a certain number of days.[8] According to Gross, Kanar described Plaintiff's signs and symptoms, but did not give a full detail of Plaintiff's medical or behavioral history. Based upon his discussion with Kanar, Gross *recommended* that Plaintiff not be transferred to a psychiatric hospital. *See* Def.'s Ex. D at 58 ("402E is cancelled per [Dr. Gross's] recommendation"). Even assuming that Gross stated that Plaintiff should not be transferred to the CNYPC, Plaintiff points to nothing in the record from which it may be determined that Gross had the final say whether Plaintiff would be transferred to CNYPC. There similarly is no evidence in the record that Kanar was not free to disagree with Gross's recommendation. To the contrary, the admission of an inmate into a psychiatric hospital is governed by N.Y. Corrections Law § 402. Pursuant to N.Y. Corrections Law § 402(9), regardless of whether Gross agreed that Plaintiff should be transferred to CNYPC, no such transfer could have occurred unless and until there were certifications from *two examining physicians* that Plaintiff suffered from a mental ill-

ness that was likely to result in serious harm to himself or others. Admission to a hospital pursuant to section 402(1) could only be made after a court had directed a medical exam by two physicians, both of whom certified that the inmate is mentally ill and in need of care and treatment. *See* Def.'s Ex. G at 62. There is no evidence in the record that any such certifications or court orders existed as of August 1999. Accordingly, there is nothing in the record from which a fair-minded trier of fact could reasonably conclude that Gross denied Plaintiff admission into the CNYPC.

Plaintiff also fails to point to anything in the record suggesting that Kanar disagreed with Gross and wanted to continue to pursue admission to a psychiatric hospital. In fact, according to Gross's deposition testimony, Kanar agreed with Gross's suggestion that Plaintiff be discharged into the general population and placed on OMH Level 1 (the highest status). Def.'s Ex. G at 40–43, 48. It, thus, appears that hospitalization was not the only reasonable avenue for dealing with Plaintiff's condition. Accordingly, assuming that Gross did deny Plaintiff admission to the CNYPC, it cannot be said that that decision was so reckless as to constitute deliberate indifference. Indeed, Kanar followed up two days later and noted that Plaintiff "does not present any symptoms or signs of mental disorder at the level of organicity, psychosis or major affective disorder." Def.'s Ex. D at 58. This further suggests that it was not unreasonable to refuse to admit Plaintiff to the CNYPC and that Gross's actions did not result in any serious injury to Plaintiff.

Based on the foregoing, a fair-minded trier of fact could not reasonably conclude that: (1) Gross had sufficient personal in-

---

**8.** Kanar apparently believed that, pursuant to case law, an inmate could not be retained in the mental observation unit indefinitely, but that some disposition had to be made within a few days. *See* Def.'s Ex. D at 58; Def.'s Ex. G at 38–40.

volvement in Plaintiff's care to be responsible for any alleged Eighth Amendment violations;[9] (2) based on Gross's lack of knowledge concerning Plaintiff's history and current diagnosis, he had sufficient knowledge of Plaintiff's condition to have deliberately disregarded a serious medical need; (3) assuming sufficient personal involvement and knowledge, that he consciously disregarded any serious risk of harm to Plaintiff; or (4) that any serious harm did, or was likely to, result from Gross's actions. The evidence reflects only a possible disagreement regarding the best course of treatment. This does not rise to the level of a constitutional violation.

### d. *January 2000 Claim Against Dr. Melendez*

On January 10, 2000, Plaintiff flooded his cell and began acting out. Plaintiff was removed from his cell and brought to the MHSU. The staff in the MHSU monitored Plaintiff's progress daily. For the first few days, Plaintiff's mental status fluctuated. At times he was uncooperative and angry while, at other times, he was quiet with no complaints. Plaintiff refused to take his medications. Accordingly, Melendez kept Plaintiff under supervision in the MHSU. Melendez met with Plaintiff three times between January 10 and January 18. For the three days prior to January 18, 2000, Plaintiff was noted to be quiet with no complaints. On January 18, 2000, Melendez evaluated Plaintiff. Melendez found Plaintiff not to

be suffering from any delusions, depression, suicidal ideations, or mania. Melendez then discharged Plaintiff back into the general population with the understanding that he would be followed by his primary therapist.

Plaintiff contends that he would have fared better if he was transferred to the CNYPC, rather than subjected to the psychologically stressful environment of the solitary housing unit and that Melendez failed to treat his symptoms of bipolar disorder in any way. The evidence in the record is that Melendez did not ignore or otherwise callously disregard Plaintiff's condition. Melendez observed Plaintiff on three separate occasions. She did not discharge him to the general population until he was quiet with no complaints for a period of three days and she evaluated him and determined that he was not suffering from any delusions, depression, suicidal ideations, or mania and that he was competent to make the decision to refuse his medications. Plaintiff's expert's conclusory statements that Melendez's judgments were "strikingly callous and ahistorical in nature" are an insufficient basis upon which a fair-minded trier of fact could reasonably conclude that Melendez departed from the ordinary standard of care, let alone acted with deliberate indifference. Aside from suggesting that Melendez should have transferred Plaintiff to the CNYPC, Plaintiff offers no evidence of what Melendez should have, or could have, done differently[10] or what harm Plaintiff

---

9. This is because Gross never examined Plaintiff, he never treated Plaintiff, and, as discussed, there is no evidence in the record that he had the authority to unilaterally halt a transfer pursuant to N.Y. Corrections Law §§ 402(1) or 402(9).

10. As previously discussed, Melendez could not have unilaterally transferred Plaintiff to a hospital. Such a move could only take place

on an emergency basis pursuant to N.Y. Corrections Law § 402(9) upon the certification of two examining physicians that Plaintiff suffered from a mental illness that was likely to cause harm to himself or others or on an involuntary basis pursuant to a court under the procedures set forth in § 402. Indeed, Melendez could have instituted one or both of these processes, but there was no guarantee that another physician would certify, or that a

may have suffered as a result of Melendez's actions. Plaintiff has failed to submit sufficient evidence from which a trier of fact could reasonably conclude that Melendez's consciously disregarded a serious risk of harm to Plaintiff.[11]

### e. Claim Against Defendant Buscema

Plaintiff also claims that Buscema was deliberately indifferent to his serious medical needs by failing to admit him to the CNYPC in March 2000. At that time, Plaintiff was being considered for admission to an assisted outpatient treatment program in light of his then-impending release date.

As previously discussed, Plaintiff could only be admitted to a psychiatric hospital pursuant to Corrections Law § 402(1) or § 402(9). He could have been admitted to the assisted outpatient treatment program pursuant to N.Y. Mental Hyg. Law § 9.60 (known as Kendra's Law) upon a court order. As of March 2000, there were no court orders and there were not two certifications from two examining physicians for admission to a psychiatric hospital. Accordingly, although Buscema may not have facilitated a transfer to a psychiatric hospital, any claimed failure to admit Plaintiff to a psychiatric hospital was not caused by Buscema.

Moreover, it is unclear what harm may have resulted from Buscema's actions (or inactions). In other words, there is no evidence that the failure to send Plaintiff to a psychiatric hospital caused him any serious harm.

### f. May 2000 Claim Against Melendez

On April 28, 2000, Plaintiff was admitted to the MHSU after starting a fire in his cell and displaying hostile, threatening behavior and acting delusional. Over the next several days, he was urinating in his cell, smearing feces on the window and otherwise acting out. Over Plaintiff's objection, Melendez ordered an injection of Haldol. On May 3, Melendez contacted CNYPC to discuss having Plaintiff admitted. Melendez decided to seek an admission to the CNYPC if Plaintiff did not show any signs of improvement. Def.'s Ex. D at 135. Based on Plaintiff's continued acute symptoms, Melendez also ordered Depakote. On May 4, Melendez decided to "pursue admission to CNYPC." *Id.* at 136. Over the next few days, however, Plaintiff's condition changed. Plaintiff began taking his medication and his condition stabilized. *Id.* Accordingly, Melendez decided not to pursue admission to CNYPC. *Id.*

Based on the foregoing facts, it cannot be said that Melendez acted with deliber-

---

Court would order, Plaintiff for admission to a hospital. Because such an admission would be dependent upon another person (and, potentially, a court), it cannot be said that Melendez caused Plaintiff not to be admitted to the CNYPC.

11. As discussed, it is unclear precisely what "serious risk" Melendez is claimed to have disregarded or what harm may have resulted from Melendez's actions (or inactions). Although Plaintiff was brought to the MHSU due to his aggravated, angry state three weeks after Melendez discharged him, Plaintiff's mental history is characterized by ebbs and flows in his mental stability. Throughout his

history of mental illness, his refusal to take medication exacerbated any problems he was experiencing. Plaintiff failed to submit evidence concerning what could, or should, have been done to ensure that he remained stable at all times. There similarly is no explanation how or why Plaintiff's aggravated, angry state constituted a serious medical condition. Although Plaintiff experienced certain acute episodes, none of them caused him any harm. Defendants always responded to his acute episodes and any dangers they may have caused (such as extinguishing the fires in his cell, removing him from his flooded cell, etc.).

ate indifference to a serious medical need. To the contrary, Melendez responded to Plaintiff's acute flare-up by having him removed to the MHSU, ordering medications, observing his behavior and contemplating an admission to the CNYPC if his conditions did not improve. Because Plaintiff became medication compliant and his condition otherwise stabilized, Melendez determined that it was not necessary to transfer Plaintiff to the CNYPC. While this may not have been the best medical decision concerning Plaintiff's psychiatric needs, it cannot be said to have been made with deliberate disregard of Plaintiff's condition. Once again, Plaintiff has also failed to demonstrate what harm resulted from Melendez's actions or inactions.

### g. June 2000—November 2000 Claims Against Ford and Singh

██ Plaintiff contends that Ford was deliberately indifferent to his serious medical needs during the period of June 2000 to November 2000 by failing to report his increasingly aggravated symptoms to a psychiatrist and failing to transfer him to the MHSU for evaluation and transfer to the CNYPC. Singh is claimed to have been deliberately indifferent by failing to monitor Plaintiff, remove him from SHU for evaluation, transfer him to the CNYPC and supervise or educate Ford concerning Plaintiff's symptoms. Plaintiff contends that Ford and Singh's indifference culminated in the November 7, 2000 fire setting incident.

To the extent Plaintiff contends that Ford or Singh should have had Plaintiff transferred to the CNYPC, this claim must be dismissed for the reasons previously discussed. As of November 2000, two examining physicians had not certified Plaintiff for admission to CNYPC. Plaintiff also fails to submit evidence of any

harm caused by any failure to transfer Plaintiff to the CNYPC.

With respect to the acute flare-up of Plaintiff's symptoms resulting in the fire-setting incident, Ford and Singh responded to Plaintiff's cell. Plaintiff was observed to not have any observable injuries, no observable symptoms and not to be in imminent danger. Plaintiff was left in SHU and not transferred to the MHSU. Several days later, on November 11, 2000, Plaintiff again started a fire in his cell. Plaintiff complained that he should never have been put in prison, that he was denied a shower and shave, that his food was bacterially contaminated, and that he would continue setting fires until his demands had been met. At that time, it was determined that Plaintiff did not display any plan to harm himself.

Although Defendants may have been able to take steps to help prevent the November 7 and November 11 fire-setting incidents, the fact remains that there is no evidence that Defendants acted with deliberate indifference or that Plaintiff was harmed by these incidents. In each instance, Defendants responded to the crisis, evaluated Plaintiff and, upon balancing their determination that he did not pose a risk to himself with security's concern that force would be required to remove Plaintiff from his cell, determined to keep him in his cell. It, therefore, cannot be said that Ford and Singh acted with deliberate indifference to Plaintiff's serious medical needs.

### h. December 2000—February 2001 Claims Against Singh

Plaintiff next contends that Singh acted with deliberate indifference by failing to make efforts to establish treatment compliance, not referring Plaintiff for hospitalization, and failing to reconsider Plaintiff's condition as having decompensated during

the period of December 2000 through February 2001.

During this period, Plaintiff was monitored by Singh. On December 5, Plaintiff was brought to the MHSU because he was setting fires in his cell and also threatened to have a weapon. In response, Plaintiff was given an injection of Haldol. By December 9, Plaintiff was again accepting oral medications. On December 11, Plaintiff was observed to have been taking his medications regularly, and doing well overall. Plaintiff was eating and sleeping well, coherent, not angry and not hallucinating. Thus, Singh discharged Plaintiff from the MHSU.

This turn of events does not demonstrate deliberate indifference. While Defendants might have been able to provide Plaintiff with better care, they did respond to his acute flare-ups. Specifically, Singh prescribed Haldol to control his condition and continued to monitor him until he became compliant and his acute symptoms dissipated. At that time, Singh discharged Plaintiff. Plaintiff submits no evidence from which a fair-minded trier of fact could reasonably conclude that Plaintiff suffered any harm as a result of Singh's actions or inactions. As previously discussed, the evidence in the record reflects that Plaintiff never sustained any physical or mental injury as a result of his mental illness and, since being discharged from Clinton, his mental condition has fared quite well.

#### i. *Claims Against Mockus*

 Plaintiff claims that Mockus was deliberately indifferent to his medical needs when, on March 5 and November 11, 2000, she did not transfer him to the MHSU or take other action concerning his mental illness. On March 5, Plaintiff was yelling, swearing and breaking things in his cell. On November 11, Plaintiff set a fire in his cell. On both occasions, Mockus responded to Plaintiff's cell, had discussions with him and determined that he was acting out because of anger over prison conditions and not because of any mental illness. Mockus also determined that Plaintiff was not a danger to himself. Accordingly, on both occasions, Plaintiff was not transferred to the MHSU.

Although Plaintiff raises concerns about the quality and appropriateness of Mockus's evaluations and actions on March 5 and November 11, he fails to submit any evidence from which a fair-minded trier of fact reasonable could conclude that she was deliberately indifferent to a serious medical need. First, Mockus responded to Plaintiff's cell on both incidents and evaluated him. She did not ignore his situation, but, rather, came to the conclusion that Plaintiff was not acting out because of a mental illness, but because of his anger over prison conditions. Even assuming Mockus did not properly evaluate Plaintiff's condition and determine that Plaintiff was in need of mental health treatment, Plaintiff fails to demonstrate how any such failure caused him harm. To the extent other medical professionals would have demanded that Plaintiff be transferred to the MHSU or commenced some other form of treatment, Mockus's actions are, at best, negligent.

Second, as previously discussed, there is no evidence that Plaintiff was harmed by Mockus's actions or inactions. The only evidence before the Court is that prison officials quelled the situation—nobody was hurt and Plaintiff did not continue acting out, breaking things or threatening corrections officers. Accordingly, the claims against Mockus must be dismissed.

#### j. *Failure to Train Claims*

Because the Court has found that none of the Defendants acted with deliberate

indifference towards a serious medical need, it need not address Plaintiff's last contention that Defendants were deliberately indifferent by failing to hire and train qualified staff.

### k. *Qualified Immunity*

 Even assuming Plaintiff has presented a constitutional violation, Defendants would be entitled to qualified immunity. Defendants are entitled to qualified immunity from suit if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harrison v. Barkley*, 219 F.3d 132, 138 (2d Cir.2000). Where a right is clearly established, "the defendants may nonetheless establish immunity by showing that reasonable persons in their position would not have understood that their conduct was within the scope of the established prohibition." *In re State Police Litig.*, 88 F.3d 111, 123 (2d Cir.1996).

It was clearly established that prisoners have a right to constitutionally adequate care and treatment. *Warren v. Keane*, 196 F.3d 330, 333 (2d Cir.1999). Reasonable persons could disagree, however, whether: (1) Plaintiff's mental condition presented a serious medical need; and (2) the failure to have Plaintiff transferred to the CNYPC or not give other care constituted a denial of constitutionally adequate care and treatment. On every occasion that Plaintiff experienced inappropriate conduct, the medical staff responded and assessed the situation. At no time was Plaintiff left to continue acting out, setting fires, flooding his cell, or threatening staff. In other words, in each case, Defendants responded to the situation and took steps to ensure that Plaintiff was under control and did not present a harm to himself and others. And, in fact, at no time did Plaintiff harm himself or anyone else. It, therefore, cannot be said that it was objectively unreasonable for Defendants to believe that their did not violate Plaintiff's Eighth Amendment rights.

### l. *State Law Claims*

Having dismissed the federal claims, the Court declines to exercise supplemental jurisdiction over the state law claims. 28 U.S.C. § 1367.

## V. CONCLUSION

For the foregoing reasons, Defendants' motions for summary judgment are GRANTED IN THEIR ENTIRETY and Plaintiff's Complaint is DISMISSED. The Clerk of the Court shall close the file in this matter.

IT IS SO ORDERED.